## No. 15-2585

# In the
# United States Court of Appeals
# for the Fourth Circuit

CAROL JEAN ONEY

*Appellant,*

v.

PENNYMAC HOLDINGS, LLC, F/K/A PENNYMAC MORTGAGE INVESTMENT
TRUST HOLDINGS AND PENNYMAC LOAN SERVICES, LLC,

*Appellees.*

On Appeal from the United States District Court
For the District of Maryland, No. 15-1525-JFM
The Hon. J. Frederick Motz, Presiding Judge

## SUPPLEMENT TO JOINT APPENDIX

Edward W. Chang
Attorney No. 27319
BLANK ROME LLP
130 N. 18th Street
One Logan Square
Philadelphia, PA 19103
(215) 569-5342
Fax: (215) 832-5342
EChang@BlankRome.com

James R. Billings-Kang
Attorney No. 29826
BLANK ROME LLP
600 New Hampshire Avenue NW
Washington, DC 20037
(202) 772-5832
Fax: (202) 572-8431
JBillings-Kang@BlankRome.com

**COUNSEL FOR APPELLEES**

## SUPPLEMENTAL TABLE OF CONTENTS

**Pages**

Original Class Action Complaint [Dkt. No. 1]................................................. **JA273**

Order on Motion to Dismiss Original Complaint [Dkt. No. 6]........................ **JA302**

Exhibit A to Motion to Dismiss [Dkt. No. 23-1] ............................................ **JA304**

Exhibit B to Motion to Dismiss [Dkt. No. 23-2]............................................. **JA312**

Exhibit C to Motion to Dismiss [Dkt. No. 23-3]............................................. **JA314**

Exhibit D to Motion to Dismiss [Dkt. No. 23-4] ............................................ **JA320**

Exhibit E to Motion to Dismiss [Dkt. No. 23-5]............................................. **JA328**

Exhibit F to Motion to Dismiss [Dkt. No. 23-6] ............................................ **JA330**

## IN THE U.S DISTRICT COURT FOR
## THE DISTRICT OF MARYLAND

**CAROL JEAN ONEY**
13320 Bobtown Rd
Princess Anne, MD 21853
Somerset County

*On behalf of herself and others similarly*
*situated*

      Plaintiff

v.

**PENNYMAC MORTGAGE INVESTMENT
TRUST HOLDINGS I, LLC
N/K/A PENNYMAC HOLDINGS LLC** Case  No.   _____
Serve on:
The Corporation Trust Company      )
Corporate Trust Center      )
1209 Orange Street      )
Wilmington, DE 19801      )

      Defendant      )

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff, Carol Jean Oney ("Oney"), individually and on behalf of all Maryland residents similarly situated and through her attorney, April T. Ademiluyi, sues Defendant PennyMac Mortgage Investment Trust Holdings I, LLC n/k/a Penny Holdings LLC ("PennyMac") and states:

1. This case arises from a systematic, intentional, and predatory debt collection activities of Defendant PennyMac upon vulnerable Maryland consumers without the mandatory collection license required by the State of Maryland. This case also involves the knowingly, illegal

1

lending practices of Defendant PennyMac in the mortgage lending process related to its lack of a license.

2. Defendant PennyMac acquires consumer, mortgage debts in default for pennies on the dollar and then proceeds to try to collect the debt by (i) filing foreclosure actions in Maryland courts and (ii) collecting payments directly or indirectly from the Plaintiff and putative class members through its servicer network(s).   Because PennyMac does not have a mandatory collection agency license required by Maryland law, it did not have the right to directly or indirectly collect any sums from the Plaintiff and the putative class members and any judgments it obtained were void as a matter of law.

3. PennyMac Mortgage Investment Trust ("PennyMac Trust") was established as a Maryland investment vehicle commonly called and referred to as a real estate investment trust within the meaning of Section 856 of the Internal Revenue Code of 1986.  Defendant PennyMac operates as a wholly-owned subsidiary of Defendant PennyMac Trust which also controls the day to day operations of Defendant PennyMac through the direction of its Board of Trustees and management staff.

4. This is the second putative class action suit on this matter initiated against Pennymac.  As a result of a previously filed action PennyMac did finally become licensed even while representing to this Court that it was not required to have a license.  The first class action suit resulted in a judgement in favor of Pennymac only because the Plaintiff entered into a forbearance agreement, bringing her loan status current with the previous owner immediately prior to Pennymac's acquisition of the loan.

## JURISDICTION AND VENUE

2

5. This Court has jurisdiction of the matters asserted herein in light of a federal question presented herein. 28 U.S.C. § 1331.

6. Venue in this District is proper in that the Defendant transacts business within the District and the conduct complained of occurred in the District.

## PARTIES

7. Plaintiff Carol Jean Oney is a Maryland resident. She resides at 13320 Bobtown Rd Princess Anne, MD 21853 ("Oney Property"). Oney is the record owner of the Ademiluyi Property.

8. Defendant PennyMac Mortgage Investment Trust Holdings I, LLC n/k/a Penny Holdings LLC is a Delaware limited liability company formed in the State of Delaware on August 6, 2009. It does business throughout Maryland.   Its principle office is located at 27001 Agoura Rd Calabasas, CA 91301.

9. Not named as a party in this Amended Class Action Complaint, PennyMac Mortgage Investment Trust is a Maryland corporation and real estate investment trust formed under Maryland law. It does business in Maryland.

## FACTS

### PENNYMAC IS FORMED

10. PennyMac collects on consumer debts in the State of Maryland for the benefit of its owners and investors including PennyMac Trust.  The consumer debts allegedly purchased by PennyMac are mortgage debts that are in default at the time PennyMac acquires them.  As of December 31, 2011, nearly 75% of PennyMac's portfolio of loans were in default or foreclosure status according to PennyMac Trust's February 8, 2012 Fourth Quarter 2001 Earnings Report made pursuant to Section 21E of the Securities Exchange Act of 1934.

3

Established in 2008, PennyMac represents that it is the largest non-bank correspondent lender in the country and a leading investor in distressed mortgage loans.

Source: http://ir.pennymacfinancial.com/CorporateProfile.aspx?iid=4376176 (last visited March 16, 2014).

11. With Citimortgage("Citi") facing a multitude of lawsuits and increased scrutiny over wrongful foreclosures and botched loan modifications, the high cost of implementing loss mitigation programs, and regulatory pressure from the FDIC over capital requirements, it was financially more suitable for Citi to unload their troubled mortgages for pennies on the dollar.

12. According to PennyMac Trust December 15, 2010 Current Report made pursuant to Section 13 or 15d of the Securities Exchange Act of 1934, PMac via its two subsidiaries purchases Citi's nonperforming loans at a discount. PennyMac is a company which operations focus primarily purchases distressed mortgage loans from Citi with the intent to quickly acquire and liquidate the property securing the loans.

13. Citi and PennyMac entered into a complicated agreement where Citi provides PennyMac with a loan to purchase their distressed mortgages. Simply stated, Citi is ultimately giving PennyMac the distressed mortgages at no cost with hopes that PennyMac can fairly quickly liquidate or sell the mortgages, and then pay Citi for the mortgages. On April 27, 2012, PennyMac completed the acquisition of $56.5million distressed mortgage loans from Citi.

## THE FIRST FILED CLASS ACTION AGAINST PENNYMAC

19. Christie Ademiluyi fell behind on her mortgage obligations with her former mortgage lender CitiMortgage, Inc. ("Citi"). Her default was due, like that of hundreds of other Maryland consumers during the current economic conditions, to a reduction of household income as a

4

licensed Maryland realtor. She also sought bankruptcy protection under the Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Maryland on August 5, 2009 (Case No. 0924463). Without objection she obtained a discharge from that court on November 4, 2009. Like many debtors, she filed a statement of intention to reaffirm the debt but reaffirmation of the debt was not carried through pursuant to 11USC§524(c). Personal liability on the note was therefore discharged.

20. On or about July 8, 2010, Citi applied an unaffordable loan modification to Ademiluyi's loan without her consent.

21. Attempting to be proactive in resolving her mortgage situation, Ademiluyi diligently requested a modification or other loss mitigation alternatives with Citi from July 2010 until January 2011.

22. In December 2010, Citi agreed to allow Ademiluyi to be considered for a loan modification and simultaneously offered Ademiluya a forbearance agreement to prevent the loan from proceeding to foreclosure.

23. On December 22, 2010, Ademiluyi accepted the forbearance agreement which amended payments due on the original note and security instrument for seventeen months, and on January 10, 2011, Ademiluyi submitted a full application for a loan modification.

24. While Ademiluyi's modification application was pending, Citi transferred its interests in the Ademiluyi mortgage loan for Plaintiff's personal residence to PennyMac on or before March 9, 2011 without recourse. This Assignment of Mortgage was recorded in the land records of Prince George's County, Maryland at Book 32565, Page 10.

5

25. PennyMac notified Ms. Ademiluyi of the transfer of her loan by letter dated March 28, 2011. In that letter, PennyMac claimed that it had acquired ownership of Ms. Ademiluyi's loan on February 28, 2011.

26. On May 20, 2011, even though Ms. Ademiluyi had been discharged of her liability for the underlying note, PennyMac threatened in a form letter without the right to do so, through its authorized mortgage servicer PennyMac Loan Services, LLC, that Ms. Ademiluyi would be liable for its costs incurred to pursue foreclosure to collect the loan.

27. For approximately one year after Pennymac acquired Ms. Ademiluyi's loan, Ms. Ademiluyi diligently fought for Pennymac to honor Citi's promises to her. On or about February 2012, Pennymac refused to offer Ms. Ademiluyi a HAMP modification but instead offered Ms. Ademiluyi a repayment plan. PennyMac acknowledged that the repayment plan offered to Ms. Ademiluyi did not bring her loan current but instead took her "delinquency [sum due] and spread it over 17 months. So you would take the payment plus the additional amount of the delinquency spread over months and that would increase the payment." Corp. Designee Dep. of Pennymac (Michael Dawdry)(1/14/2014), Page 23, Line 25 through Page 24, Line 3.

28. On January 30, 2012, PennyMac sent to Ms. Ademiluyi a Notice of Intent to Foreclose identifying itself as the "secured party" of Ms. Ademiluyi's mortgage loan associated with the Ademiluyi Property.

14. Upon Pennymac's refusal to honor Citi's promises, Ms. Ademiluyi discovered the Pennymac did not have a debt collector license to carry out their business arrangement with Citi or any other entity that disposes of its distressed mortgage loans and initiated a class action suit against Pennymac Trust and Pennymac Holdings.

6

15. Within a few months of commencing the first filed action, Pennymac immediately sought a mortgage lender license to meet the exception to the requirement a debt collection license pursuant to MD. ANN. CODE, BUS. REG. ART., § 7-101, et seq. ("MCALA"). The Department of Labor and Licensing granted that license on August 9, 2012.

16. Discovery in the first filed case established:

    a. "PennyMac Holdings", when it owns a mortgage, purchases a mortgage to own it. It's the owner. It's the investor." Corp. Designee Dep. of Pennymac (Jeffrey Cogin)(1/14/2014), Page 10 at Lines 1-3.

    b. PennyMac never sells any interest in the mortgage loans it acquires. Corp. Designee Dep. of Pennymac (Jeffrey Cogin)(1/14/2014), Page 10, Lines 5-

    c. PennyMac hires servicer(s) to collect on its behalf upon the loans it owns. Corp. Designee Dep. of Pennymac (Jeffrey Cogin)(1/14/2014), Page 11 at Lines14 through Page 13, Line 2.

    d. PennyMac does not have any employees and contracts with other companies for mortgage servicing operations to act with "complete authority" on its behalf pursuant to a "mortgage servicing agreement."

    Corp. Designee Dep. of Pennymac (Jeffrey Cogin)(1/14/2014), Page 16, Line 23 through Page 17, Line 14.

    e. PennyMac only offers loan modifications to borrowers indirectly through its retained servicers. Corp. Designee Dep. of Pennymac (Jeffrey Cogin)(1/14/2014), Page 16, Line 23 through Page 17, Line 14.

    f. PennyMac does not know whether it ever makes any inquiries from an assignor about the status of the loan, except for the payment due date, at the time it acquires the loan.

7

Corp. Designee Dep. of PennyMac (Michael Dawdry)(1/14/2014), Page 28, Line 21

through Page 29, Line 2.

g. PennyMac does not even inquire if the loan transferred to it was discharged

in bankruptcy. Corp. Designee Dep. of PennyMac (Michael Dawdry)(1/14/2014),

Page 29, Lines 12-14. PennyMac only runs a Pacer search if a borrower tells them

the debt was discharged. Id. at Page 82, Lines 5-10.

h. PennyMac is not aware of any training programs it or its servicers provides directly

or indirectly to their employees concerning the collection of debts which have been

discharged in bankruptcy. Corp. Designee Dep. of PennyMac (Michael

Dawdry)(1/14/2014), Page 31, Lines 9-17.

i. PennyMac is not aware of what process it utilized to send out letters to borrowers in

2011. Corp. Designee Dep. of PennyMac (Michael Dawdry)(1/14/2014), Page 33,

Lines 17-21.

j. PennyMac, through its authorized mortgage servicers acquires the credit scores of the

borrowers and non-borrower contributors as part of the mortgage modification

application process but does not send the scores to the borrower and non-borrower

contributors. Dep. of A. Serrano (1/15/2014) at Page 9, Line 8 through Page 10, Line

7; Page 16, Lines 7

k. PennyMac testified that the only reason it applied for and accepted a license as a

mortgage lender in the State of Maryland was on the "[a]dvice of counsel" and it

does not believe that its work involves the mortgage lending business, mortgage

brokering business, offer loss mitigation or loan modifications. Corp. Designee Dep.

of PennyMac (Jeffrey Cogin)(1/14/2014), Page 34, Lines 5-14.

8

29. Before commencement of the first filed action, PennyMac had never held licenses to act as a debt collection agency, mortgage lender, or collection agency in the State of Maryland. However, it owned and collected upon at that time and during the class period an interest in more than fifty Maryland residential, mortgage loans including that of the Plaintiff and other Maryland consumers.  As the owner of these mortgage loans it has collected payments directly or indirectly from Plaintiff and class members without the right to so and did not operate in the State of Maryland as a bona fide and legally, licensed mortgage lender and/or collection agency.

30. PennyMac Holdings is a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(4)(6) since it is a business engaged in purchasing and collecting on defaulted debts by using interstate wires and mail among other acts.

31. PennyMac and PennyMac Trust act as a "collection agency" as defined by Maryland Collection Agency Licensing Act, MD. ANN. CODE, BUS. REG. ART., § 7-101, et seq. ("MCALA").  Under MD. ANN. CODE, BUS. REG. § 7-301, a person must have a license to do business as a collection agency in the State of Maryland unless they are a licensed mortgage lender pursuant to.§7-102.  However, neither has now nor at any time in the past ever had a collection agency license as required by MCALA.  According to its representations to the State of Maryland and in discovery in the first filed action, PennyMac does not extend, new mortgages in the State of Maryland and merely acquires mortgages from others. Corp. Designee Dep. of PennyMac (Jeffrey Cogin)(1/14/2014), Page 7, Line 20 through Page 9, Line 10 (disclosing Exhibit 1 to the same deposition).

32. Upon information and belief and according to public records, PennyMac has acted directly as "debt collector" under the FDCPA in more than 50 occurrences in the State of Maryland in the year before the commencement of this action through August 9, 2012 by attempting

9

to collect debts against Maryland consumers through foreclosure, collection actions filed in Maryland state courts and Maryland land records as well as claims reported to the U.S. Bankruptcy Court for Maryland.

33. As part of its routine and on-going collection practices PennyMac collects monthly mortgage payments and/or reinstatement sums by the Plaintiff and class members through the mails and interstate wires. PennyMac also collects through civil litigation in Maryland Courts filed as foreclosure actions.

34. As part of its routine and on-going collection practices, PennyMac offers through its affiliates financial incentives of $8,700 or more to its borrowers, including the Plaintiff and class members, to participate in its "foreclosure avoidance program" which is a colorful way to describe a deed-in-lieu of foreclosure or short sale of the property.

35. PennyMac registered to do business in the State of Maryland on April 21, 2011. In that registration with the State Department of Assessments and Taxation ("SDAT"), PennyMac's authorized representative Jeffrey P. Grogin falsely stated that PennyMac had not done business in the State of Maryland prior to its registration. The statement was false given the public records of the state and federal courts in Maryland which show PennyMac was involved in multiple mortgage properties and transactions prior to April 21, 2011 as part of its business practices, including acting as a collection agency.

36. Every collection effort in Maryland by PennyMac or PennyMac Trust without a Collection Agency or mortgage lender license, including each and every foreclosure action filed in Maryland courts on their behalf as well as the collection of any mortgage payments, and each and every judgment lien filed in Maryland, is an unfair or deceptive trade practice since these actions were committed with the right to do so as stated by the legislature.

10

37. Defendant PennyMac did not have the mandatory license required by MCALA but continued its business of collecting debts acquired in default and filed collection lawsuits in Maryland courts without the right to do so until it obtained a license on or about August 9, 2012. Pennymac conceded in discovery of the first filed action that it indirectly collected upon these debts through its affiliate PennyMac Loan Services, LLC which retains foreclosure counsel and/or pursues collections activity on its behalf as the owner of the Plaintiff's and Class Members' loans.

38. On May 22, 2015, District Judge Ellen L. Hollander granted summary judgment in favor of Holdings because Ms. Ademiluyi was compliant with the forbearance agreement she entered into with Citi at the time Pennymac acquired the loan thus her loan was not in default as required by FDCPA to qualify Pennymac as a debt collector. Furthermore, the Court concluded no reasonable juror could find that Pennymac believed the Ms. Ademiluyi's loan was in default at the time it acquired it and Citi was servicing the loan. ECF 108

### FACTUAL ALLEGATIONS RELATING TO NAMED PLAINTIFF

19. In late 2010, Ms. Oney fell behind on her mortgage payments to Citi for her personal residence due to a loss of employment of a family member who contributes to her household income.

20. Ms. Oney's personal liability on the mortgage loan was discharged in a Chapter 7 bankruptcy on or about February 22, 2011. Ms. Oney, like Ms. Ademiluyi and many other debtors, did indicate on her statement of intention that she intended to reaffirm the debt but that process was not carried out pursuant to 11USC§524(c). Thus personal liability on her loan was properly discharged.

11

21. While Ms Oney's loan was in default, Citi transferred its interests in the Oney mortgage loan to PennyMac on or before July 14, 2011 without recourse. This Assignment of Mortgage was recorded in the land records of Somerset County, Maryland at Book 0809, Page 150.

22. Unlike Ms. Ademiluyi, Ms. Oney and all members of the class did not sign any such forbearance agreement or any other type of repayment plan to resolve her delinquency with Citi. Pennymac acquired Ms. Oney's loan while it was in default and therefore acted as a debt collector has defined by FDCPA.

23. On June 23, 2011, Citi wrote a letter to Ms. Oney indicating that she was delinquent $6, 694, which included six mortgage payments and a returned check fee. Exhibit 1

24. Approximately two weeks after Citi attempted to collect on six past due mortgage payments, on July 11, 2011, Pennymac directly contacted Ms. Oney to advise her that it purchased her loan on June 17, 2011 and the Pennymac Loan Servicing will service the loan on their behalf. She was further advised to contact Pennymac directly, if she has any questions regarding the notice. Exhibit 2

25. In the first filed action, Pennymac alleges that of the 181 mortgage loans owned during the putative class period, on behalf of Pennymac, it's servicer sent 162 loss mitigation solicitation letters that resulted in 32 mortgagors receiving HAMP or a proprietary modification. *Ademiluyi v. Pennymac Mortgage Investment Trust Holdings* 1:12-cv-00752 ECF105 p. 8 ¶24-26.

JA284

26. Ms Oney was proactive in attempting to solver her mortgage default.  Upon information and belief, Pennymac offered Ms. Oney a repayment plan that increased her mortgage payments by spreading the period to pay back the delinquency over time and tacking that payment on to the current mortgage payment.  Ms. Oney paid the repayment plan but eventually fell delinquent again because her payments were too high.

27. Ms. Oney, relying on Pennymac's representations that a loan modification is an alternative to foreclosure completed the loan modification Pennymac sent to her. Of course, Pennymac denied that application.  Ms. Oney, baffled by the denial of the loan medication, hired an attorney to assist with the loan modification process because it was too difficult to pursue without assistance.

28. From 2014 through the present, Ms. Oney has incurred legal expenses to try to resolve her mortgage situation without the need for litigation.  However, these efforts have not resolved the situation nor received any meaningful consideration of her timely and complete requests for an escalated modification request.  PennyMac has not relied or offered any alternative to Ms. Oney for any information or application from Ms. Oney for a modification or other loss mitigation option.

29. On September 5, 2014, Pennymac initiated foreclosure proceedings against Ms. Oney.  Ms. Oney has filed Chapter 13 Bankruptcy (Case No:15-16930) to work out payment arrangements on her mortgage loan and eliminate other numerous unsecured debts.

30. As a result of Defendant's illegal collection actions described above, Ms. Oney has suffered damages including but not limited to: (i) fees incurred to retain attorneys to attempt to

13

resolve her modification issues; (ii) emotional damages manifested by embarrassment, stress, sleeplessness, etc.; and (iii) sums collected directly and indirectly by PennyMac to which it had no legal right to collect since it did not have the mandatory license as a collection agency. The Class members have incurred similar damages.

## CLASS ALLEGATIONS

31. Plaintiff brings this complaint on behalf of a class of all other persons similarly situated to her.

32. The class is comprised of all persons in the State of Maryland, who within three years prior to the filing of the initial complaint through August 11, 2012 were contacted by the Defendant, directly or indirectly, in connection with any effort to collect a debt which the Defendant acquired an ownership interest when that debt was in default.

33. This is a matter in which the one year FDCPA statute of limitations may be enlarged because PennyMac effectively and intentionally concealed information which would have made its improper and illegal activities discoverable. The concealment was accomplished by failing to disclose facts about its legal status and/or lack of a license to legally operate in the State of Maryland and other means. Such disclosure was the affirmative duty of PennyMac

34. The Named Plaintiff and Class members had no reason to know of the true illegal nature of the illegal acts of the Defendant since the Defendant routinely omits or misrepresents certain information from the class members concerning the illegal nature of how the Defendant collected defaulted consumer debts in the State of Maryland before becoming licensed. No

14

reasonable person would have expected or believed the Defendant's collection activities were illegal and subject to criminal penalties. Md. Code Ann., Bus. Reg. § 7-401.

35. This case is one of those rare instances where circumstances external to the conduct of the Named Plaintiffs and class members which warrant a finding that it would be unconscionable to enforce the various limitations periods against the class members since such an act would create a gross injustice of allowing the Defendant to wrongfully and unjustly enriched to the detriment of the class by knowingly and willfully acting in violation of Maryland law as demonstrated by Defendant's false and misleading statements to the State of Maryland when it finally (i) registered to do business and (ii) became a licensed as a mortgage lender operating in the State of Maryland.

36. Plaintiff estimates the class to consist of more than 50 persons. In discovery, PennyMac has identified more than fifty other persons to Plaintiff. Further, Plaintiff has identified through public records research that PennyMac other class members not disclosed in discovery by PennyMac. If presented with an Order of the Court, the Commissioner of Financial Regulation of the State of Maryland would also be able, based upon discovery obtained in this case, to produce a list of persons identified to it on Notices of Intent to Foreclose in which PennyMac was identified as a secured party and such a list likely exceeds 50 persons.

37. The class is so numerous as to make it impracticable to join all members of the class.

38. There are questions of law and fact which are common to all members of the class, including:

    a. Whether PennyMac has acted as a debt collection agency in the State of Maryland;

    b. Whether PennyMac was licensed to act as a debt collection agency in

15

Maryland at the times relevant to this complaint;

c. Whether PennyMac failed to provide notices required by the Fair Debt
Collection Protection Act; and

d. Whether PennyMac threatened or took actions that neither had a right to take under
federal law.

39. The only individual questions concern the identification of class members and who are
entitled to any funds that the Defendant is ordered to disgorge as the fruit of its unlawful
activities and/or share in any statutory or other damages permitted by law. This information
can be determined by a ministerial examination of public records in various court houses or
from the Defendant's business records or other sources, which are admissible as an
exception to the hearsay rule and as an admission by a party.  In discovery of the first filed
action,

a. PennyMac has explained that its communications with borrowers is part of a "very
sophisticated operation…[with] notes [and] telephone calls that are kept in software
programs" for all borrowers and has report functions. Corp. Designee Dep. of
PennyMac (Jeffrey Cogin)(1/14/2014), Page 20, Line through Page 21, Line 4.


b. PennyMac's uniform report functions are able to determine how many borrowers
respond to its modification efforts.  Corp. Designee Dep. of PennyMac (Jeffrey
Cogin)(1/14/2014), Page 21, Lines 11-20.

c. PennyMac's software tracks details of borrowers' loans and advises PennyMac is a
loan is current or not and the last paid installment made on the loan. Corp. Designee
Dep. of PennyMac (Michael Dawdry)(1/14/2014), Page 22, Lines 9-25.  PennyMac

JA288

also uses a standard industry software called MSP to track "loan comments" for borrower loans. Corp. Designee Dep. of PennyMac (Michael Dawdry)(1/14/2014), Page 38, Line 24 through Page 39, Line 9. *See also* Page 94, Lines 16-24.

d.  At the time a loan is transferred to PennyMac, it receives the "due date" on the loan acquired electronically. Corp. Designee Dep. of PennyMac (Michael Dawdry)(1/14/2014), Page 28, Lines 3-8.

e.  PennyMac utilizes a "batch" system to send standard letters to borrowers depending upon certain trigger events such as delinquency dates and a software program schedules such letters. Designee Dep. of PennyMac (Michael Dawdry)(1/14/2014), Page 34, Line 25 through Page 35, Line 18.

f.  PennyMac tracks and reports the success rate(s) for certain communications and collection efforts. Designee Dep. of PennyMac (Michael Dawdry)(1/14/2014), Page 47, Lines 10-23.

g.  PennyMac's authorized servicer utilizes a "Fastrieve system, which keeps a history of all images that are sent to customers." Dep. of M. Hernandez (1/15/2014), Page 18, Line 22 through Page 19, Line 9.

h.  PennyMac's authorized servicer also records borrower phone calls and communications. Dep. of M. Hernandez (1/15/2014), Page 12, Lines 13-15.

40. Plaintiff's claims are typical of the claims of the class members. In discovery of the first filed action, Pennymac confirmed that their letters to borrowers are standard and uniform and cannot be individually modified. Designee Dep. of PennyMac (Michael Dawdry)(1/14/2014), Page 64, Lines 1-3.

17

41. Plaintiff will fairly and adequately protect the interests of all class members in the prosecution of this action. She is similarly situated with the members of the class she seeks to represent. She feels that she has been wronged, wishes to obtain redress of the wrong, and wants Defendant stopped from perpetrating similar wrongs on others.

42. To that end, Plaintiff has retained counsel experienced in handling class action suits involving unfair or deceptive business practices that harm consumers.

43. Neither the Named Plaintiff nor her counsel have any adverse interest which might cause them not to vigorously pursue this action.

44. Defendant PennyMac by acting as a debt collection agency without a license and sending false and misleading threats and other statements to Maryland borrowers similarly situated to the Class.

45. Each class member reasonably relied upon PennyMac and PennyMac Trust's direct and indirect representations that each was licensed and permitted to operate legally in the State of Maryland. No reasonable person would believe that businesses such as PennyMac nor PennyMac Trust would operate illegally and commit the violation which carry criminal penalties under MCALA.

## COUNT I

**(Class and Individual Claims for Violation of the Fair Debt Collections Act)**

46. Plaintiff incorporates the foregoing allegations.

47. The Defendant has violated the FDCPA by acting as a debt collector when it do not hold a license as a collection agency but was required to do so under MCALA (or even the

18

Maryland mortgage lender law) in violation of 15 U.S.C. § 1692e(5) and other provisions of the FDCPA.

48. The practice of operating illegally without a mandatory license is an unfair or deceptive practice in violation of 15 U.S.C. § 1692f.

49. The Defendant's unlicensed debt collection is a material violation of the FDCPA since it is a material violation of a law designed to protect consumers from improper collection activities and no reasonable person, including the Plaintiff and each class member, in the State of Maryland would have considered it possible that the Defendant would subject itself to the criminal penalties of the Maryland law while collecting on consumer debts.

50. The FDCPA provides for statutory damages in addition to actual damages (if requested). PennyMac has stipulated that its net worth would entitle the putative class to the maximum available under the FDCPA. Designee Dep. of PennyMac (Michael Dawdry)(1/14/2014), Page 88, Lines 21-25.

51. The Plaintiff and Class are entitled to statutory damages from the Defendant. The Plaintiff is not seeking her actual damages or actual damages on behalf of the Class; Plaintiff only seeks statutory damages on her behalf and on behalf of the Class.

WHEREFORE, Plaintiff prays that the Court enter judgment against the Defendant for the following:

    a. Certify this case as a class action with the named plaintiff as class representative and her attorneys as counsel on behalf of the class described herein;

    b. Award Statutory damages in the amount allowed by the FDCPA equal to $500,000.00;

c. Award reasonable attorney's fees, litigation expenses and costs; and

## COUNT II - VIOLATION OF MARYLAND'S CONSUMER PROTECTION ACT, Md. Code Ann. Com. Law § 13-101 et. seq.(ONEY'S INDIVIDUAL CLAIM)

19. Plaintiff incorporates the foregoing allegations.

20. It is both unfair and deceptive for a Maryland licensed mortgage servicer to not meaningfully comply with Md. Code Regs. 09.03.06.20, which imposes a duty of good faith and fair dealing in the servicing of Oney's loan.

21. Pennymac affirmed in an affidavit in support of a Maryland mortgage lender license that it does not modify loans. Exhibit 3. Pennymac also testified under oath it does not believe its business involves mortgage lending or mortgage loan modification. *Ademiluyi v. Pennymac Mortgage Investment Trust Holdings* 1:12-cv-00752 ECF[60-2] Corp. Designee Dep. of PennyMac (Jeffrey Cogin)(1/14/2014), Page 34, Lines 5-14. Pennymac 's true intent is to liquidate homes to make a profit. It is not beneficial for Pennymac to modify mortgage loans.

22. By engaging in the acts and omissions set forth above, by making the misrepresentations set forth above and by failing to disclose material facts where the failure to do so deceived Pennymac has committed unlawful or deceptive trade practices in violation of the Maryland Consumer Protection Act. Sec. 13-301(1) and (3) ("MCPA").

23. Pennymac's conduct had the capacity, tendency or effect of deceiving Ms. Oney, who was in fact deceived or misled, causing injury and loss through misrepresenting in many communications with Ms. Oney that it offers loan modification programs that "adjust the

20

terms of her loan to potentially make your payments and/or debt more manageable based on your household finances" as an alternative to foreclosure and soliciting an application from her. Exhibit 4

24. Ms. Oney relied to her detriment on those communications by hiring attorneys and/or private companies to work out a loan modification on her behalf.

25. As a result of Pennymac's conduct, Ms. Oney now lives with constant anxiety, depression, sleeplessness, humiliation and has incurred fees and cost.

WHEREFORE, Ms. Ademiluyi request the following:

a.    She be awarded as part of this claim a sum of no less than $20,000, subject to amendment, which represents their compensatory damages as a result of the Defendant's, direct and indirect, unfair or deceptive practices;

b.    She be awarded her reasonable attorney's fees and costs; and

c.    Her claim should include such other and further relief as the Court deems just and proper.



                              Respectfully Submitted,

                              _s/April Ademiluyi_____
                              April Ademiluyi, Esq.(Bar No 29141)
                              The Law Office of April T. Ademiluyi
                              10411 Motor City Dr Ste 750
                              Bethesda, MD 20817
                              Ph: 443-393-3984
                              Fax: 443-393-0416

                              *Attorney for Plaintiff and Class*

                                        21

# ONEY
# ENTERPRISES

# CAROL ONEY
# BUSINESS OWNER
**13320 BOBTOWN RD**
**PRINCESS ANNE, MD 21853**
**PHONE 410-651-9639 (HOME)**
**CELL 410-726-4895**

# FAX COVER SHEET

**TO:** April            **FAX:** 443-393-0416

**FROM:** Carol Oney  **DATE:** 5/23/15

**RE:** PennyMac CitiMortgage  **TOTAL PAGES:** 5

**COMMENTS:** This is what I
have found so far

JA295

CitiMortgage

**citi**

www.citimortgage.com

06/23/11

CAROL JEAN  ONEY
13320 BOBTOWN RD
PRINCESS ANNE MD   21853-3358

Dear CitiMortgage Client(s):

We are writing to inform you that your bank returned your check/draft
#3 in the amount of $1,148.24 because of insufficient funds.

This matter requires your immediate attention.  The reversal of this
payment may have caused your account to become delinquent and could
result in your delinquency being reported to our subscribing credit
reporting agencies.

To correct this matter, the total amount due of $6,694.47
which includes a $15.00 returned check fee, must be sent today in
certified funds.  Currently, your 01/01/11 payment is due.  Please
remit your funds to the following payment address:

                    CitiMortgage, Inc.
                    P.O. Box 183040
                    Columbus, OH 43218-3040

We appreciate your prompt attention to this matter.  To contact us you
may visit our website at www.citimortgage.com or access our Automated
Account Information Line, which is available 24 hours a day at
1-800-283-7918*.  Customer Service Associates are available 7 days a
week:
Monday - Friday    7:00 a.m. to 12:00 a.m., ET
Saturday           8:00 a.m. to 7:00 p.m., ET
Sunday            12:00 p.m. to 11:00 p.m., ET
When contacting us, refer to your mortgage account number, 5003550618.

We value your business and look forward to serving you in the future.

Sincerely,

Customer Service Department

©2010 CitiMortgage, Inc. CitiMortgage, Inc. does business as Citicorp Mortgage in NM. CitiMortgage, Inc. is an equal housing lender. Citi, Citi and Arc Design, and Citi and Arc Design are registered service
marks of Citigroup Inc. *Calls are randomly monitored and recorded for quality assurance. CitiMortgage is a debt collector and any information obtained will be used for that purpose.

CitiMortgage



www.citimortgage.com

Page Two
06/23/11
5003550618

STATE OF NEVADA
COUNTY OF CLARK

### AFFIDAVIT OF SERVICE BY MAIL

Jolene Markwith

_____, being first duly sworn on oath,
deposes and states that he/she is of legal age and that on 06/23/11,
he/she served the attached Notice of Dishonor enclosed in an envelope
addressed as follows:

                13320 Bobtown Rd
                Princess Anne        MD 21853-3358

and deposited same, with postage prepaid, in the United States mail at

P.O. Box 689196 Des Moines, IA 50368-9196

Signature

Subscribed and sworn to before me this ___ day of _____, 20 _11_ .

Notary Public
XXXXXXXXXXXXXXXX County, (STATE)

My commission expires:

(SEAL)



BARBARA BREEN
Notary Public, State of Nevada
Appointment No. 10-1656-1
My Appt. Expires Jan 8, 2014

XXXXXXXXXXXXXXXX

110623B0000083

©2010 CitiMortgage, Inc. CitiMortgage, Inc. does business as Citicorp Mortgage in NM. CitiMortgage, Inc. is an equal housing lender. Citi, Arc Design, and Citi and Arc Design are registered service marks of Citigroup Inc. *Calls are randomly monitored and recorded for quality assurance. CitiMortgage is a debt collector and any information obtained will be used for that purpose.

Appeal: 15-2585    Doc: 22    Filed: 02/26/2016    Pg: 28 of 61

To: 14433930416  From: 14106519639   Date: 05/24/15  Time: 1:26 PM Page: 01
     Carol Oney                                        410-651-9639           p.1
Case 1:15-cv-01525-JFM  Document 1-4  Filed 05/27/15  Page 1 of 1



P.O. Box 514387
Los Angeles, CA 90051-4387

**Notification of Assignment, Sale or Transfer of Your Mortgage Loan**

July 15, 2011

0803453-0000905 873792
Carol Oney
13320 Bobtown Rd
Princess Anne MD 21853

Re:    Loan Number: 1000039112
       13320 Bobtown Rd Princess Anne MD 21853

Dear Carol Oney:

The purpose of this notice is to inform you that your mortgage loan referenced above was sold to PennyMac Mortgage Investment Trust Holdings 1, LLC on June 17, 2011. PennyMac Mortgage Investment Trust Holdings 1, LLC does not service your loan. This letter will provide you with information on how to contact your new servicer having authority to act on behalf of PennyMac Mortgage Investment Trust Holdings 1, LLC. Please note, this letter does not require any action to be taken on your part but is simply a courtesy notification of the assignment, sale or transfer of your mortgage loan. Below is your new servicer's contact information should you have any questions or concerns about your loan.

The transfer of mortgage loans is a standard part of the mortgage business for many of the nation's mortgage lenders. The transfer of your mortgage loan to PennyMac Mortgage Investment Trust Holdings 1, LLC does not affect any terms or conditions of the Mortgage/Deed of Trust or Note. The transfer of ownership of your mortgage loan has not been publicly recorded.

It is important that you send your monthly loan payments directly to the new servicer at the address below and on your monthly statement. Please do not send payments to PennyMac Mortgage Investment Trust Holdings 1, LLC as they may be returned to you, which could result in late charges and your account becoming past due. All correspondence and inquiries concerning your mortgage loan also should be addressed to your new servicer. We rely on the mortgage servicer to manage your mortgage on our behalf and work directly with you. Your new servicer has authority to act on our behalf with regard to the administration of your mortgage loan and respond to any questions about your loan.

       New Servicer: PennyMac Loan Services, 27001 Agoura Road STE 350 Calabasas CA 91301
       Address for sending payments: P.O. Box 30597 Los Angeles CA 90030
       Toll-free telephone number for inquiries: 866-601-3518
       Website: www.PennyMacUSA.com

If you have questions regarding this notice, you may contact PennyMac Mortgage Investment Trust Holdings 1, LLC at 27001 Agoura Road STE 310 Calabasas CA 91301, 818-224-7442.

MARYLAND MORTGAGE LENDER
SWORN STATEMENT

LICENSEE NAME:        PennyMac Mortgage Investment Trust Holdings I, LLC
                     NMLS ID No. 363268

LICENSE NUMBER:      *pending

MARYLAND BUSINESS

STATE OF CALIFORNIA   )
                      ) SS.
COUNTY OF VENTURA     )

I, Jeffrey P. Grogin, hereby affirm the following:

1.   Licensee does not service loans for third parties;

2.   Licensee does not offer credit repair services;

3.   Licensee does not offer loan modification; and

4.   Licensee does not offer loss mitigation.

Jeffrey P. Grogin

Sworn to before me this
___ day of July, 2012.

Notary Public

ANGELA EVEREST
COMM. #1940817
Notary Public - California
Los Angeles County
My Comm. Expires June 18, 2015

1007203.1

To: 14433930416   From: 14106519639   Date: 05/26/15   Time: 7:30 PM Page: 01
Carol Oney                                      410-651-9639                     p.1
Case 1:15-cv-01525-JFM   Document 1-6   Filed 05/27/15   Page 1 of 2



**PennyMac**℠

P.O. Box 514387
Los Angeles, CA 90051-4387

**Notice Date:** May 05, 2014

**Loan Number:** 1000039112
**Property Address:**
13320 Bobtown Rd
Princess Anne MD 21853

0000305-0000000 030000

Carol Oney
13320 Bobtown Rd
Princess Anne MD 21853

---

**REGARDING YOUR LOAN**

PennyMac Loan Services, LLC ("PennyMac") wants to help you stay in your home and manage the financial challenges affecting your ability to pay your mortgage. As your mortgage servicer, we are fully committed to reviewing your current financial situation to see if you qualify for a loan modification or other foreclosure prevention alternative. This letter will provide you with helpful information and instructions to guide you through the process of applying for these programs.

**Property Valuation**
We may order an appraisal or other forms of valuations to determine the property's value in the course of reviewing your application. If we do order any valuations in connection with the application in determining whether your loan qualifies for a loan modification, a copy of the valuation(s) will be provided to you along with the notice approving or declining your application.

---

**WHY YOU RECEIVED THIS SECOND NOTICE**

Your last mortgage payment was due on November 01, 2013. As a result, you may begin receiving foreclosure notices if you do not bring your mortgage current soon.

**This is your SECOND notice.** You may lose eligibility for a Loan Modification program if you do not return this package by **May 20, 2014.**

We offer many programs to avoid foreclosure. One program, in particular, is the Home Affordable Modification Program ("HAMP"), which is a federally designed program to help homeowners achieve a more affordable and sustainable mortgage payment. By providing the required documentation and information to PennyMac, we will be able to determine if you qualify for this program or other alternative to foreclosure.

To assist you through this process, I have been assigned as your single point of contact. As your single point of contact I am available to:

- Manage the required tasks to determine your eligibility for these programs, along with the time required by you to complete those activities to ensure compliance with all applicable requirements;
- Coordinate and track documents provided by you, and promptly notify you when additional information is required; and
- Provide you with a timely status of our evaluation of your application for these programs.

---

**WHAT WE NEED FROM YOU**
To review your mortgage loan for a modification, PennyMac must receive a complete Loan Modification Application which consists of the following documents that are included in this package:

➤ Request for Mortgage Assistance Form
➤ Financial Statement Form
➤ Borrower's Authorization Form
➤ Tax Authorization Form 4506T-EZ

**Take the necessary steps today to gain peace of mind and control over your financial situation.**

Step 1: Complete the required forms.
Step 2: Provide supporting documentation, as outlined in the following pages.
Step 3: Return all documents to PennyMac no later than May 20, 2014 or you may lose eligibility for a Loan Modification program.
Step 4: Retain a copy of all documents for your records.

WELMOD2014
JA300



P.O. Box 514387
Los Angeles, CA 90051-4387

**Notice Date:** October 06, 2014
**Loan Number:** 1000039112
**Property Address:**
13320 Bobtown Rd
Princess Anne MD 21853

5.1.192 1 KB 0.432  90224811.csv 3006 000192 000427 001/002



CAROL ONEY
13320 BOBTOWN RD
PRINCESS ANNE MD 21853-3358

---

### ABOUT YOUR LOAN

PennyMac wants to work with you to resolve your delinquency issues and help you manage the financial challenges that may be affecting your ability to pay your mortgage. Let us tell you about your options and show you how we can help.

---

### WHAT THIS MEANS

Your monthly mortgage payment is now past due. We have not received the payment due on November 01, 2013 or any subsequent payments. As a result, you may begin receiving foreclosure notices if you do not bring your mortgage current soon.

I have been assigned as your Relationship Manager to assist you from falling further behind on your mortgage payments. My primary responsibility is to work with you and explore the home retention programs and foreclosure alternatives available to you and prevent a foreclosure sale. As your single point of contact, I am available to:

- Discuss programs and foreclosure prevention alternatives such as:

  - Repayment Plan – Repay your delinquent balance along with your regular monthly payments over a period of time.
  - Forbearance Plan – Make reduced payments or no payments over a period of time while you resolve the circumstance of your default. Then, enter into a Repayment Plan or apply for a Modification.
  - Modification – Adjust the terms of your loan to potentially make your payments and/or debt more manageable based on your household finances.
  - Short Sale – Sell your home for less than the total amount you owe on your mortgage loan without having to pay back the difference. This option may include relocation assistance to help you transition to a new home.
  - Deed-in-Lieu of Foreclosure – Transfer ownership of your property to the lender in lieu of a foreclosure action and make no further payments on your mortgage loan. This option may also include relocation assistance.

- Manage the required tasks to determine your eligibility for those programs, along with the time required by you to complete those activities to ensure compliance with all applicable requirements;
- Coordinate and track documents provided by you, and promptly notify you when additional information is required; and
- Provide you with a timely status of the evaluation of your application for those programs.

---

### ACTION REQUIRED

Act now to get the help you need! Call me today to learn about your options and see if you qualify for a more affordable payment.

We offer many programs to avoid foreclosure and ensure your credit is not negatively impacted. The sooner we know what you're facing, the more we can do to help you work through it.



This is an attempt by a debt collector to collect a debt. However, if your account is subject to pending bankruptcy proceedings or if you have received a discharge in bankruptcy, this statement is for informational purposes only and is not an attempt to collect a debt against you personally.

## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

Chambers of
**Ellen Lipton Hollander**
District Court Judge

101 West Lombard Street
Baltimore, Maryland 21201
410-962-0742

July 24, 2015

MEMORANDUM TO COUNSEL

Re:   *Oney v. PennyMac Mortgage Investment Trust Holdings I, LLC*
      Civil Action No. ELH-15-01525

Dear Counsel:

As you know, plaintiff filed suit against defendant on May 27, 2015. ECF 1. On June 30, 2015, defendant filed a "Motion to Dismiss the Complaint or, in the Alternative, to Strike Allegations". ECF 4 ("Motion"). Plaintiff did not file a timely response to defendant's Motion. *See* Local Rule 105.2(a). However, on July 24, 2015, twenty-four days after defendant filed its Motion, plaintiff filed an Amended Complaint. ECF 5.

Under Fed. R. Civ. P. 15(a)(1), a "party may amend its pleading once as a matter of course within: (A) 21 days after serving it, or (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Pursuant to Rule 15(a)(2), "[i]n all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires."

Because plaintiff did not otherwise respond to the Motion, it appears that plaintiff intends to cure the defects identified in the Motion with her Amended Complaint. Nonetheless, plaintiff missed the deadline, pursuant to Fed. R. Civ. P. 15(a)(1)(B), to amend her Complaint as of right. *See* ECF 4; ECF 5. Therefore, pursuant to Rule 15(a)(2), plaintiff must obtain defendant's consent or the Court's leave in order to amend her Complaint. It does not appear that plaintiff obtained, or even requested, defendant's consent before she filed her Amended Complaint.

Nevertheless, rejection of plaintiff's filing would only serve to slow the progress of this case. Accordingly, I will GRANT plaintiff leave to file her Amended Complaint (ECF 5). And, because the filing of an Amended Complaint renders moot any motion to dismiss filed with respect to a superseded pleading, I will DENY defendant's Motion (ECF 4), as moot. *See, e.g., Young v. City of Mt. Ranier*, 238 F.3d 567, 572 (4th Cir. 2001) ("As a general rule, 'an amended pleading ordinarily supersedes the original and renders it of no legal effect.'") (citations omitted); *accord Buechler v. Your Wine & Spirit Shoppe, Inc.*, 846 F. Supp. 2d 406, 414 (D. Md.) (denying motion to dismiss as moot after amendment of complaint), *aff'd*, 479 F. App'x 497 (4th Cir. 2012).

Of course, this Order is without prejudice to defendant's right to renew its motion to dismiss, but with respect to the Amended Complaint. In addition, within fourteen days from the date of docketing of this Order, defendant may move to rescind this Order as improvidently granted.

Despite the informal nature of this Memorandum, it is an Order of the Court, and the Clerk is directed to docket it as such.

Very truly yours,

/s/

Ellen Lipton Hollander
United States District Judge

- 2 -

# Exhibit A

136044.01332/101257930v.1

10-K 1 d839354d10k.htm 10-K

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, DC 20549

## Form 10-K

(Mark One)

☒  ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2014

Or

☐  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission file number: 001-34416

# PennyMac Mortgage Investment Trust
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Maryland** | **27-0186273** |
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |
| **6101 Condor Drive, Moorpark, California** | **93021** |
| (Address of principal executive offices) | (Zip Code) |

**(818) 224-7442**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| **Title of Each Class** | **Name of Each Exchange on Which Registered** |
|---|---|
| Common Shares of Beneficial Interest, $0.01 Par Value | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.  Yes ☐   No ☒

JA305

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act (check one):

Large accelerated filer ☒                                                                    Accelerated filer ☐

Non-accelerated filer   ☐ (Do not check if a smaller reporting company)        Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

As of June 30, 2014 the aggregate market value of the registrant's common shares of beneficial interest, $0.01 par value ("common shares"), held by non-affiliates was $1,604,798,645 based on the closing price as reported on the New York Stock Exchange on that date.

As of February 23, 2015, there were 74,510,159 common shares of the registrant outstanding.

**Documents Incorporated By Reference**

| Document | Parts Into Which Incorporated |
|---|---|
| Definitive Proxy Statement for 2014 Annual Meeting of Shareholders | Part III |

Table of Contents

PENNYMAC MORTGAGE INVESTMENT TRUST
FORM 10-K
December 31, 2014
TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| Special Note Regarding Forward-Looking Statements | | 2 |
| PART I | | 4 |
| Item 1 | Business | 4 |
| Item 1A | Risk Factors | 12 |
| Item 1B | Unresolved Staff Comments | 41 |
| Item 2 | Properties | 42 |
| Item 3 | Legal Proceedings | 42 |
| Item 4 | Mine Safety Disclosures | 42 |
| PART II | | 42 |
| Item 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 42 |
| Item 6 | Selected Financial Data | 44 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 45 |
| Item 7A | Quantitative and Qualitative Disclosures About Market Risk | 95 |
| Item 8 | Financial Statements and Supplementary Data | 95 |
| Item 9 | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 95 |
| Item 9A | Controls and Procedures | 96 |
| Item 9B | Other Information | 98 |
| PART III | | 98 |
| Item 10 | Directors, Executive Officers and Corporate Governance | 98 |
| Item 11 | Executive Compensation | 98 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 98 |
| Item 13 | Certain Relationships and Related Transactions, and Director Independence | 98 |
| Item 14 | Principal Accounting Fees and Services | 98 |
| PART IV | | 99 |
| Item 15 | Exhibits and Financial Statement Schedules | 99 |
| | Signatures | |

1

JA307

Table of Contents

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Annual Report on Form 10-K ("Report") contains certain forward-looking statements that are subject to various risks and uncertainties. Forward-looking statements are generally identifiable by use of forward-looking terminology such as "may," "will," "should," "potential," "intend," "expect," "seek," "anticipate," "estimate," "approximately," "believe," "could," "project," "predict," "continue," "plan" or other similar words or expressions.

Forward-looking statements are based on certain assumptions, discuss future expectations, describe future plans and strategies, contain financial and operating projections or state other forward-looking information. Examples of forward-looking statements include the following:

- projections of our revenues, income, earnings per share, capital structure or other financial items;
- descriptions of our plans or objectives for future operations, products or services;
- forecasts of our future economic performance, interest rates, profit margins and our share of future markets; and
- descriptions of assumptions underlying or relating to any of the foregoing expectations regarding the timing of generating any revenues.

Our ability to predict results or the actual effect of future events, actions, plans or strategies is inherently uncertain. Although we believe that the expectations reflected in such forward-looking statements are based on reasonable assumptions, our actual results and performance could differ materially from those set forth in the forward-looking statements. There are a number of factors, many of which are beyond our control that could cause actual results to differ significantly from management's expectations. Some of these factors are discussed below.

You should not place undue reliance on any forward-looking statement and should consider the following uncertainties and risk factors, as well as the risks, risk factors and uncertainties discussed elsewhere in this Report and any subsequent Quarterly Reports on Form 10-Q.

Factors that could cause actual results to differ materially from historical results or those anticipated include, but are not limited to:

- changes in our investment objectives or investment or operational strategies, including any new lines of business or new products and services that may subject us to additional risks;
- volatility in our industry, the debt or equity markets, the general economy or the real estate finance and real estate markets specifically, whether the result of market events or otherwise;
- events or circumstances which undermine confidence in the financial markets or otherwise have a broad impact on financial markets, such as the sudden instability or collapse of large depository institutions or other significant corporations, terrorist attacks, natural or man-made disasters, or threatened or actual armed conflicts;
- changes in general business, economic, market, employment and political conditions, or in consumer confidence and spending habits from those expected;
- declines in real estate or significant changes in U.S. housing prices or activity in the U.S. housing market;
- the availability of, and level of competition for, attractive risk-adjusted investment opportunities in mortgage loans and mortgage-related assets that satisfy our investment objectives;
- the inherent difficulty in winning bids to acquire distressed loans or correspondent loans, and our success in doing so;
- the concentration of credit risks to which we are exposed;
- the degree and nature of our competition;
- our dependence on our manager and servicer, potential conflicts of interest with such entities and their affiliates, and the performance of such entities;
- changes in personnel and lack of availability of qualified personnel at our manager, servicer or their affiliates;
- the availability, terms and deployment of short-term and long-term capital;
- the adequacy of our cash reserves and working capital;

2

**Table of Contents**

- our ability to maintain the desired relationship between our financing and the interest rates and maturities of our assets;

- the timing and amount of cash flows, if any, from our investments;

- unanticipated increases or volatility in financing and other costs, including a rise in interest rates;

- the performance, financial condition and liquidity of borrowers;

- the ability of our servicer, which also provides us with fulfillment services, to approve and monitor correspondent sellers and underwrite loans to investor standards;

- incomplete or inaccurate information or documentation provided by customers or counterparties, or adverse changes in the financial condition of our customers and counterparties;

- changes in the number of investor repurchases or indemnifications and our ability to obtain indemnification or demand repurchase from our correspondent sellers;

- the quality and enforceability of the collateral documentation evidencing our ownership and rights in the assets in which we invest;

- increased rates of delinquency, default and/or decreased recovery rates on our investments;

- our ability to foreclose on our investments in a timely manner or at all;

- increased prepayments of the mortgages and other loans underlying our mortgage-backed securities ("MBS") or relating to our mortgage servicing rights ("MSRs"), excess servicing spread ("ESS") and other investments;

- the degree to which our hedging strategies may or may not protect us from interest rate volatility;

- the effect of the accuracy of or changes in the estimates we make about uncertainties, contingencies and asset and liability valuations when measuring and reporting upon our financial condition and results of operations;

- our failure to maintain appropriate internal controls over financial reporting;

- technologies for loans and our ability to mitigate security risks and cyber intrusions;

- our ability to obtain and/or maintain licenses and other approvals in those jurisdictions where required to conduct our business;

- our ability to detect misconduct and fraud;

- our ability to comply with various federal, state and local laws and regulations that govern our business;

- developments in the secondary markets for our mortgage loan products;

- legislative and regulatory changes that impact the mortgage loan industry or housing market;

- changes in regulations or the occurrence of other events that impact the business, operations or prospects of government agencies such as the Government National Mortgage Association ("Ginnie Mae"), the Federal Housing Administration (the "FHA"), the Veterans Administration (the "VA") or the U.S. Department of Agriculture ("USDA"), or government-sponsored entities such as the Federal National Mortgage Association ("Fannie Mae") or the Federal Home Loan Mortgage Corporation ("Freddie Mac") (Fannie Mae, Freddie Mac and Ginnie Mae are each referred to as an "Agency" and, collectively, as the "Agencies"), or such changes that increase the cost of doing business with such entities;

- the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act") and its implementing regulations and regulatory agencies, and any other legislative and regulatory changes that impact the business, operations or governance of mortgage lenders and/or publicly-traded companies;

- the Consumer Financial Protection Bureau ("CFPB") and its recently issued and future rules and the enforcement thereof;

- changes in government support of homeownership;

- changes in government or government-sponsored home affordability programs;

- limitations imposed on our business and our ability to satisfy complex rules for us to qualify as a real estate investment trust ("REIT") for U.S. federal income tax purposes and qualify for an exclusion from the Investment Company Act of 1940 (the "Investment Company Act") and the ability of certain of our subsidiaries to qualify as REITs or as taxable REIT subsidiaries ("TRSs") for U.S. federal income tax purposes, as applicable, and our ability and the ability of our subsidiaries to operate effectively within the limitations imposed by these rules;

- changes in governmental regulations, accounting treatment, tax rates and similar matters (including changes to laws governing the taxation of REITs, or the exclusions from registration as an investment company);

3

JA309

Table of Contents

- our ability to make distributions to our shareholders in the future;
- the effect of public opinion on our reputation;
- the occurrence of natural disasters or other events or circumstances that could impact our operations; and
- our organizational structure and certain requirements in our charter documents.

Other factors that could also cause results to differ from our expectations may not be described in this Report or any other document. Each of these factors could by itself, or together with one or more other factors, adversely affect our business, results of operations and/or financial condition.

Forward-looking statements speak only as of the date they are made, and we undertake no obligation to update any forward-looking statement to reflect the impact of circumstances or events that arise after the date the forward-looking statement was made.

## PART I

### Item 1.    Business

*The following description of our business should be read in conjunction with the information included elsewhere in this Report. This description contains forward-looking statements that involve risks and uncertainties. Actual results could differ significantly from the projections and results discussed in the forward-looking statements due to the factors described under the caption "Risk Factors" and elsewhere in this Report. References in this Report to "we," "our," "us," "PMT," or the "Company" refer to PennyMac Mortgage Investment Trust and its consolidated subsidiaries, unless otherwise indicated.*

### Our Company

We are a specialty finance company that invests primarily in residential mortgage loans and mortgage-related assets. We were organized in Maryland on May 18, 2009, and began operations on August 4, 2009. We conduct substantially all of our operations, and make substantially all of our investments, through PennyMac Operating Partnership, L.P. (our "Operating Partnership") and its subsidiaries. A wholly-owned subsidiary of ours is the sole general partner, and we are the sole limited partner, of our Operating Partnership.

The management of our business and execution of our operations is performed on our behalf by subsidiaries of PennyMac Financial Services, Inc. ("PFSI" or "PennyMac"). PFSI is a specialty financial services firm with a comprehensive mortgage platform and integrated business focused on the production and servicing of U.S. residential mortgage loans and the management of investments related to the U.S. residential mortgage market. Specifically:

- We are managed by PNMAC Capital Management, LLC ("PCM" or our "Manager"), a subsidiary of PennyMac and an investment adviser registered with the Securities and Exchange Commission ("SEC") that specializes in, and focuses on, residential mortgage assets.
- All of the loans we acquire in our correspondent production operations are acquired, pooled for sale, sold and/or securitized on our behalf by another PennyMac subsidiary, PennyMac Loan Services, LLC ("PLS" or our "Servicer"), which also services most of the loans we hold in our investment portfolio and almost all of the loans for which we retain the obligation to service as a result of our correspondent lending operations.

Our objective is to provide attractive risk-adjusted returns to our investors over the long-term, primarily through dividends and secondarily through capital appreciation. Our targeted investments are in the U.S. residential mortgage market. We are primarily focused on investing in distressed mortgage loans available for acquisition from financial institutions, engaging in correspondent lending and investing in other mortgage related assets.

Our Manager is experienced in acquiring distressed residential mortgage assets that are sold by financial institutions including banks, thrifts, and non-bank mortgage lenders. Since late 2009, our Manager has seen substantial volumes of nonperforming residential mortgage loans available for purchase from certain U.S. banks at significant discounts to their unpaid principal balances. Our Manager believes that there are several reasons these banks are motivated to sell nonperforming loans, including the following: the ability to release capital tied to nonperforming assets; the ability to relieve strain on their operations resulting from managing nonperforming loans and real estate acquired in settlement of loans ("REO"); the ability to reduce the percentages of their assets that are nonperforming, a key measure monitored by bank regulators, investors, and other stakeholders; and the ability for these banks to manage perceptions of the continued drag on their overall performance from legacy distressed assets through controlled sales of nonperforming assets.

In our distressed mortgage loan investment activities, the mortgage loans we purchase are generally at discounts to their unpaid principal balance ("UPB"), reflecting their distressed state or perceived higher risk of default, as well as a greater likelihood of

4

Table of Contents

collateral documentation deficiencies. Prior to the acquisition of loans or other assets, our Manager validates key information provided by the sellers that is necessary to determine the value of the asset. We then seek to maximize the value of the mortgage loans that we acquire. The objective for performing loans is value enhancement through effective "high touch" servicing, which is based on significant levels of borrower outreach and contact, and the ability to implement long-term, sustainable loan modification and restructuring programs that address borrowers' ability and willingness to pay their mortgage loans. Alternatively, for nonperforming loans and real estate assets, the ability to effect property resolution in a timely, orderly and economically efficient manner is essential to generating attractive returns.

Through our management agreement with PCM and our loan servicing agreements with our loan servicers (primarily PLS), we work with borrowers to perform loss mitigation activities. For both performing and nonperforming loans we use loan modification programs (such as the U.S. Departments of the Treasury and Housing and Urban Development's Home Affordable Modification Program ("HAMP")) and workout options that we believe have the highest probability of successful resolution for both us and our borrowers. Loan modification or resolution may include our accepting a reduction of the principal balances of certain mortgage loans in our investment portfolio. We expect these methods to increase our portfolio of performing loans, reduce default rates and enhance the value of loans in our portfolio. We believe that by using these methods, we can provide borrowers with long-term solutions that address their willingness and ability to pay their mortgage loans. Once we have improved the credit quality of a loan, we intend to monetize the enhanced value through various disposition strategies. When loan modifications and other efforts are unable to cure distressed loans, our objective is to effect timely acquisition and liquidation of the property securing the mortgage loan.

As our Manager, PCM conducts activities including developing our investment strategies, sourcing and acquiring mortgage loans and mortgage-related assets for our investment portfolio, and developing the appropriate approach to be taken by PLS for each loan as it performs its specialty servicing. As our loan servicer, PLS services the mortgage loans we acquire. PLS performs prime servicing with respect to the loans underlying our MSRs, which are generally prime credit quality with low delinquency and default rates. PLS also performs special servicing for the distressed whole loans we have acquired. Special servicing utilizes a "high touch" approach to establish and maintain borrower contact and facilitate loss mitigation strategies. As part of its execution of PCM's portfolio strategy, PLS may modify or refinance loans in our investment portfolio and originate loans to finance the sale of REO. In addition, PLS provides mortgage banking services in support of our correspondent production activities.

Correspondent production includes the acquisition of newly originated, prime credit quality, first-lien residential mortgage loans that have been underwritten to investor guidelines, pooling such loans into MBS and selling the resulting securities into the secondary markets. We purchase Agency eligible loans and jumbo loans. A jumbo loan is a loan in an amount that exceeds the maximum loan amount for eligible loans under Agency guidelines. We then sell or securitize Agency eligible loans meeting the guidelines of Fannie Mae and Freddie Mac on a servicing-retained basis whereby we retain the related MSRs; government loans (insured by the FHA or guaranteed by the VA), which we sell to PLS, a Ginnie Mae approved issuer and servicer; and jumbo mortgage loans, which, generally on a servicing-retained basis, we securitize or sell to third parties.

Our correspondent production business has grown through purchases from approved mortgage originators that meet specific criteria related to management experience, financial strength, risk management controls and loan quality. The management team at PFSI has prior experience with the majority of these mortgage originators. As of December 31, 2014, 344 sellers have been approved, primarily independent mortgage originators and small banks located across the United States. We purchased approximately $28.4 billion at fair value of loans in 2014, including $11.5 billion of conventional loans and $16.5 billion of government-insured loans. In the fourth quarter of 2014 we were the third largest correspondent lender in the United States as ranked by Inside Mortgage Finance.

We have elected to be taxed as a REIT for U.S. federal income tax purposes and we intend to maintain our exclusion from regulation under the Investment Company Act. Therefore, we are required to invest a substantial majority of our assets in loans secured by real estate and in real estate-related assets. Subject to maintaining our REIT qualification and our Investment Company Act exclusion, we do not have any limitations on the amounts we may invest in any of our targeted asset classes.

Our internet address is www.pennymacmortgageinvestmenttrust.com. We make available free of charge, on or through the investor relations section of our web site, annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, as well as proxy statements, as soon as reasonably practicable after we electronically file such material with, or furnish it to, the SEC.

### Our Manager and Our Servicer

We are externally managed and advised by PCM pursuant to a management agreement. PCM specializes in and focuses on residential mortgage loans. PCM also serves as the investment manager to two private investment funds, which we refer to as the PennyMac funds, with investment objectives and policies relating to distressed mortgage loans that are substantially similar to ours. The combined net assets of the entities managed by PCM, including our shareholders' equity, amounted to approximately $2.0 billion as of December 31, 2014.

5

# **Exhibit B**

136044.01332/101257930v.1



O. Box 514387
Angeles, CA 90051-4387

**Notification of Assignment, Sale or Transfer of Your Mortgage Loan**

July 15, 2011

0000453-0000453 172702
Carol Oney
13320 Bobtown Rd
Princess Anne MD 21853

Re:    Loan Number█████████
       13320 Bobtown Rd Princess Anne MD 21853

Dear Carol Oney:

The purpose of this notice is to inform you that your mortgage loan referenced above was sold to PennyMac Mortgage Investment Trust Holdings 1, LLC on June 17, 2011. PennyMac Mortgage Investment Trust Holdings 1, LLC does not service your loan. This letter will provide you with information on how to contact your new servicer having authority to act on behalf of PennyMac Mortgage Investment Trust Holdings 1, LLC. Please note, this letter does not require any action to be taken on your part but is simply a courtesy notification of the assignment, sale or transfer of your mortgage loan. Below is your new servicer's contact information should you have any questions or concerns about your loan.

The transfer of mortgage loans is a standard part of the mortgage business for many of the nation's mortgage lenders. The transfer of your mortgage loan to PennyMac Mortgage Investment Trust Holdings 1, LLC does not affect any terms or conditions of the Mortgage/Deed of Trust or Note. The transfer of ownership of your mortgage loan has not been publicly recorded.

It is important that you send your monthly loan payments directly to the new servicer at the address below and on your monthly statement. Please do not send payments to PennyMac Mortgage Investment Trust Holdings 1, LLC as they may be returned to you, which could result in late charges and your account becoming past due. All correspondence and inquiries concerning your mortgage loan also should be addressed to your new servicer. We rely on the mortgage servicer to manage your mortgage on our behalf and work directly with you. Your new servicer has authority to act on our behalf with regard to the administration of your mortgage loan and respond to any questions about your loan.

New Servicer: PennyMac Loan Services, 27001 Agoura Road STE 350 Calabasas CA 91301
Address for sending payments: P.O. Box 30597 Los Angeles CA 90030
Toll-free telephone number for inquiries: 866-601-3518
Website: www.PennyMacUSA.com

If you have questions regarding this notice, you may contact PennyMac Mortgage Investment Trust Holdings 1, LLC at 27001 Agoura Road STE 310 Calabasas CA 91301, 818-224-7442.

106Nbtor

JA313

# **Exhibit C**

136044.01332/101257930v.1



8101 Condor Drive
Moorpark, CA 93021

August 29, 2012

CAROL JEAN ONEY
13320 BOBTOWN RD
PRINCESS ANNE MD 21853

Re: Repay to Reinstatement Modification Program
    Loan Number: [ ]
    Foreclosure Sale Date: N/A
    13320 BOBTOWN RD
    PRINCESS ANNE MD 21853

Dear CAROL JEAN ONEY

Congratulations! You are approved to enter into a Repay to Reinstatement Modification Program provided to you by PennyMac Loan Services (PennyMac). This is the first step toward reinstating your loan and bringing it current. We understand today's challenging financial environment and, with regard to your home loan, believe that the following payment plan provides you with the best solution to your particular situation.

Based on our recent phone conversation, PennyMac is pleased to provide you with the attached schedule of payments that make up this Repay to Reinstatement Modification plan. Upon successful completion of the installments outlined in Appendix A, the remaining delinquent interest, escrow and fees will be capitalized and added to the principal balance of the loan. Please review the details of the schedule for accuracy.

What you need to do...

To accept this offer, you must first make a down payment as shown on Appendix A on or before the due date ( or, if no down payment is required then your first Trial Payment). Please call a PennyMac Loan Specialist, toll-free at 866-545-9070 to schedule your payments, by no later than 11/01/2012. To identify that you have been accepted for the Trial Period, please provide the following code when you call to make your payments: LMTN  NOTE: You should make any normal mortgage payment that becomes due prior to the start of the Trial Period.

After all Trial Period payments are timely made and you have submitted all the required documents, your mortgage will be permanently modified. (Your existing loan and loan requirements remain in effect and unchanged during the Trial Period.) If the down payment (if any) is not received by its due date, and if each trial payment is not received by PennyMac in the month in which it is due, this offer will end and your loan will not be modified.

We appreciate the opportunity to assist you!

Sincerely,

PennyMac Loan Services

Attachments:  Terms and Conditions
              Appendix A
              State-Specific Collection Notices
              PennyMac Offer

REPAYREIN 022512       *This is an attempt to collect a debt and any information obtained will be used for that purpose.*

JA315





6101 Condor Drive
Moorpark, CA 93021

**Repay to Reinstatement Modification Program Terms and Conditions**

**ABOUT THIS OFFER**

- If you make your new payments in a timely manner we will not conduct a foreclosure sale.
- If your monthly payment did not include escrows for taxes and insurance, you are now required to do so prior to the start of the trial plan.
- Your credit score may be adversely affected by accepting a trial period plan. The impact of a permanent modification on a credit score depends on the homeowner's entire credit profile. For more information about your credit score, go to http://www.ftc.gov/bcp/edu/pubs/consumer/credit/cre24.shtm.

**PAYMENTS CALCULATION:**

Your trial period payment is approximately the payment you will be required to make if your loan is successfully modified. In addition, if your existing payment includes mortgage insurance premiums, this amount will also be added to your payment. The remaining delinquent interest, escrow and fees will be capitalized and added to the principal balance of the loan.

The modified payment should be sufficient to pay the principal and interest as well as property taxes, insurance premiums and other permissible escrow fees based on our recent analysis of these costs. Your modified monthly payment may change if your property taxes and insurance premiums change. If you did not have an escrow account before, the timing of your tax and insurance bills may require that you make a payment to cover any such bills when they come due. This is known as an escrow shortage. Your loan has an escrow shortage of $3,626.67; this will be capitalized when the loan is modified (this amount is subject to change). If you wish to pay the total shortage as a lump sum, please contact us at 1.866.545.9070.

**DOWN PAYMENT:**

If a down payment is required as part of your Repay to Reinstatement Program, the down payment will be applied to your account in the following order:
    1. Principal and interest payments
    2. Escrows
    3. Other fees
    4. Principal balance

**BREACH:**

This Agreement will automatically terminate if you breach any of its provisions. There is no right to cure or further notice required under this Agreement. We will not refund to you any funds we collect under this Agreement in the event you breach any provision of this Agreement, as such funds will be applied to reduce the outstanding indebtedness.

**TERMS:**

Your current loan documents remain in effect; however, you may make the trial period payment instead of the payment required under your loan documents:

You agree that all terms and provisions of your current mortgage note and mortgage security instrument remain in full force and effect and you will comply with those terms; and that nothing in the trial period plan shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the loan documents.

REPAYREIN 022312    *This is an attempt to collect a debt and any information obtained will be used for that purpose.*

                                
6101 Condor Drive
Moorpark, CA 93021

**Repay to Reinstatement Modification Program Terms and Conditions continued**

**CAPITALIZATION:**

The remaining delinquent interest, escrow and fees will be capitalized and added to the principal balance of the loan once you successfully complete your Trial Plan.

**SUSPENSION OF FORECLOSURE:**

We will not proceed to foreclosure sale during the trial period, provided you are complying with the terms of the Trial Period Plan

Any pending foreclosure action or proceeding that has been suspended may be resumed if you are notified in writing that you failed to comply with the terms of the Trial Period Plan or do not qualify for a permanent modification.

You agree that the servicer will hold the Trial Period Payments (as opposed to any down payment) in an account until sufficient funds are in the account to pay your oldest delinquent monthly payment. You also agree that the servicer will not pay your interest on the amounts held in the account. If any money is left in this account at the end of the Trial Period Plan, those funds will be deducted from amounts that would otherwise be added to your modified principal balance.

The servicer's acceptance and posting of your new payment during the trial period will not be deemed a waiver of the acceleration of your loan (or foreclosure actions) and related activities, and shall not constitute a cure of your default under your loan unless such payments are sufficient to completely cure your entire default under your loan.

**ESCROWS:**

If your monthly payment did not include escrows for taxes and insurance, you are now required to do so unless prohibited by applicable law:

You agree that any prior waiver that allowed you to pay directly for taxes and insurance is revoked. You agree to establish an escrow account and to pay required escrows into that account.

REPAYREIN 022312          *This is an attempt to collect a debt and any information obtained will be used for that purpose.*




8101 Condor Drive
Moorpark, CA 93021

**APPENDIX A**

**Payment Plan Report**
**Schedule of Payments**
**Loan #**

| **Down-payment Due Date** | **Down-payment Amount\*** |
|---|---|
| 1. 09/13/2012 | $1,000.00 |

| **Payment Due Date** | **Trial Payment** |
|---|---|
| 1. 11/01/2012 | $1,052.08 |
| 2. 12/01/2012 | $1,052.08 |
| 3. 01/01/2013 | $1,052.08 |

\* Down payments of $5,000 and over require certified funds, meaning cashier's check, Western Union Quick Collect or money order payable to PennyMac Loan Services, LLC.  Lender may accept or reject partial payments.

Western Union Information:

City Code: PennyMac
State Code: CA
Reference your loan number.

REPAYREM 022312          *This is an attempt to collect a debt and any information obtained will be used for that purpose.*

JA318



6101 Condor Drive
Moorpark, CA 93021

**State-Specific Legal Notices**

The following states require that disclosures be given to residents of those states in certain circumstances. You may also have rights in those or other states not specifically mentioned below. Note that if you are delinquent on your payments, any information that you provide us or that we collect will be used for debt collection purposes.

If you are a **CALIFORNIA** Resident: AS REQUIRED BY LAW, YOU ARE HEREBY NOTIFIED THAT A NEGATIVE CREDIT REPORT REFLECTING ON YOUR CREDIT RECORD MAY BE SUBMITTED TO A CREDIT REPORTING AGENCY IF YOU FAIL TO FULFILL THE TERMS OF YOUR CREDIT OBLIGATIONS. BUT, WE WILL NOT SUBMIT A NEGATIVE CREDIT REPORT TO A CREDIT REPORTING AGENCY ABOUT THIS OBLIGATION UNTIL THE EXPIRATION OF ANY TIME PERIOD DESCRIBED. THE STATE ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT AND THE FEDERAL FAIR DEBT COLLECTION PRACTICES ACT REQUIRE THAT, EXCEPT UNDER UNUSUAL CIRCUMSTANCES, COLLECTORS MAY NOT CONTACT YOU BEFORE 8AM OR AFTER 9PM. THEY MAY NOT HARASS YOU BY USING THREATS OF VIOLENCE OR ARREST OR BY USING OBSCENE LANGUAGE. COLLECTORS MAY NOT USE FALSE OR MISLEADING STATEMENTS OR CALL YOU AT WORK IF THEY KNOW OR HAVE REASON TO KNOW THAT YOU MAY NOT RECEIVE PERSONAL CALLS AT WORK. FOR THE MOST PART, COLLECTORS MAY NOT TELL ANOTHER PERSON, OTHER THAN YOUR ATTORNEY OR SPOUSE, ABOUT YOUR DEBT. COLLECTORS MAY CONTACT ANOTHER PERSON TO CONFIRM YOUR LOCATION OR ENFORCE A JUDGEMENT. FOR MORE INFORMATION ABOUT DEBT COLLECTION ACTIVITIES, YOU MAY CONTACT THE FEDERAL TRADE COMMISSION AT 1-877-FTC-HELP or www.ftc.gov.

If you are a **COLORADO** Resident: A CONSUMER HAS THE RIGHT TO REQUEST IN WRITING THAT A DEBT COLLECTOR OR COLLECTION AGENCY CEASE FURTHER COMMUNICATION WITH THE CONSUMER. A WRITTEN REQUEST TO CEASE COMMUNICATION WILL NOT PROHIBIT THE DEBT COLLECTOR OR COLLECTION AGENCY FROM TAKING ANY OTHER ACTION AUTHORIZED BY LAW TO COLLECT THE DEBT. FOR INFORMATION ABOUT THE COLORADO FAIR DEBT COLLECTION PRACTICES ACT, SEE www.coloradoattorneygeneral.gov/ca. PENNYMAC'S COLORADO OFFICE LOCATION: 717 SEVENTEENTH STREET, SUITE 2300, DENVER, CO 80202, (866) 436-4766.

If you are a **MAINE** Resident: PENNYMAC OPERATING HOURS ARE 7:00 A.M. UNTIL 6:00 P.M. PACIFIC TIME MONDAY THROUGH FRIDAY AND 7:00 AM UNTIL 11:00 AM PACIFIC TIME SATURDAY. YOU MAY CONTACT OUR OFFICE DURING BUSINESS HOURS BY CALLING (866) 545-9070.

If you are a **MINNESOTA** Resident: THIS COLLECTION AGENCY IS LICENSED BY THE MINNESOTA DEPARTMENT OF COMMERCE.

If you are a **NEW YORK** Resident: THIS COLLECTION AGENCY IS LICENSED BY THE CITY OF NEW YORK, LICENSE NUMBER 1294096. THIS COLLECTION AGENCY IS ALSO LICENSED BY THE CITY OF BUFFALO, LICENSE NUMBER 551910.

If you are a **TEXAS** Resident: COMPLAINTS REGARDING THE SERVICING OF YOUR MORTGAGE SHOULD BE SENT TO THE DEPARTMENT OF SAVINGS AND MORTGAGE LENDING, 2601 N. LAMAR, SUITE 201, AUSTIN, TX 78705. A TOLL-FREE CONSUMER HOTLINE IS AVAILABLE AT (877) 276-5550.

If you are a **UTAH** Resident: AS REQUIRED BY LAW, YOU ARE HEREBY NOTIFIED THAT A NEGATIVE CREDIT REPORT REFLECTING ON YOUR CREDIT RECORD MAY BE SUBMITTED TO A CREDIT REPORTING AGENCY IF YOU FAIL TO FULFILL THE TERMS OF YOUR CREDIT OBLIGATIONS. BUT, WE WILL NOT SUBMIT A NEGATIVE CREDIT REPORT TO A CREDIT REPORTING AGENCY ABOUT THIS OBLIGATION UNTIL THE EXPIRATION OF ANY TIME PERIOD DESCRIBED.

**Notice to PennyMac Customers Currently in Foreclosure**

1. If your home is currently in foreclosure and you wish to apply for the federal government's loan modification program (HAMP), you must contact us at least 7 days prior to foreclosure sale.
2. All HAMP applications received less than 1 month from a scheduled foreclosure date must contain all required documentation in order to be considered for a modification (HAMP), or a foreclosure alternative (HAFA) program. If you are not able to provide all required documentation, you must include a written explanation for all missing documentation.

**Licensing Information**

Equal Housing Lender. © 2008-2012 PennyMac Loan Services, LLC, 6101 Condor Drive, Moorpark, CA 93021, 818-224-7442. Trade/service marks are the property of PennyMac Loan Services, LLC, and /or its subsidiaries. NMLS ID #35953. Licensed by the Department of Corporations under the California Residential Mortgage Lending Act; Illinois Residential Mortgage Licensee #MB.6760586. Minnesota: This is not an offer to enter into an agreement and an offer may only be made pursuant to Minn. Stat. §47.206 (3) & (4). Licensed by the Mississippi Department of Banking and Consumer Finance. Licensed by the New Hampshire banking department. Licensed by the N.J. Department of Banking and Insurance. Licensed by the Virginia State Corporation Commission, #MC-5311. Washington Consumer Loan License #CL-35953. For a complete listing of state licenses, please visit our website at http://www.pennymacusa.com/licenses.php. Some products may not be available in all states. Information, rates and pricing are subject to change without prior notice at the sole discretion of PennyMac Loan Services, LLC. All loan programs subject to borrowers meeting appropriate underwriting conditions. This is not a commitment to lend. Other restrictions apply. All rights reserved.

15-3019

REPAYREN 022312          *This is an attempt to collect a debt and any information obtained will be used for that purpose.*

# Exhibit D

Recording Requested By:
PENNYMAC LOAN SERVICES, LLC

And After Recording Return To:
PENNYMAC LOAN SERVICES, LLC C/O
FIRST AMERICAN DOCUMENT SOLUTIONS 450 EAST
BOUNDARY STREET CHAPIN, SOUTH CAROLINA
29036

———————————————— [Space Above This Line For Recording Data] ————————————————

Investor Loan #: ▮▮▮▮▮▮▮

# MODIFICATION AGREEMENT

Borrower ("I"): Carol Jean Oney

Lender or Servicer ("Lender"): **PENNYMAC LOAN SERVICES, LLC**

Date of first lien mortgage, deed of trust, or security deed ("Mortgage") and Note ("Note"): August 07, 2006

Loan Number: ▮▮▮▮▮▮▮

Property Address ("Property"): 13320  BOBTOWN RD, PRINCESS ANNE, MD 21853

If my representations and covenants in Section 1 continue to be true in all material respects, then this
Modification Agreement ("Agreement") will, as set forth in Section 3, amend and supplement (1) the Mortgage
on the Property, and (2) the Note secured by the Mortgage. The Mortgage and Note together, as they may
previously have been amended, are referred to as the "Loan Documents." Capitalized terms used in this
Agreement and not defined have the meaning given to them in Loan Documents.

I understand that after I sign and return two copies of this Agreement to the Lender, the Lender will send me a
signed copy of this Agreement. This Agreement will not take effect unless the preconditions set forth in Section
2 have been satisfied.

MODIFICATION AGREEMENT
Form 3157 3/09 (rev. 10/10)
CA3157NGSE.LMA 02/21/12

Page 3

1. **My Representations and Covenants.** I certify, represent to Lender, covenant and agree:

A.    I am experiencing a financial hardship, and as a result, (i) I am in default under the Loan Documents or my default is imminent, and (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future;

B.    There has been no impermissible change in the ownership of the Property since I signed the Loan Documents. A permissible change would be any transfer that the Lender is required by law to allow, such as a transfer to add or remove a family member, spouse or domestic partner of the undersigned in the event of a death, divorce or marriage;

C.    I have provided documentation for all income that I receive (and I understand that I am not required to disclose child support or alimony unless I chose to rely on such income when requesting to qualify for the Modification Program ("Program");

D.    Under penalty of perjury, all documents and information I have provided to Lender in connection with this Agreement, including the documents and information regarding my eligibility for the Program, are true and correct;

E.    If Lender requires me to obtain credit counseling in connection with the Program, I will do so; and

F.    I have made or will make all payments required under a Trial Period Plan.

2. **Acknowledgments and Preconditions to Modification.** I understand and acknowledge that:

A.    If prior to the Modification Effective Date as set forth in Section 3 the Lender determines that any of my representations in Section 1 are no longer true and correct or any covenant in Section 1 has not been performed, the Loan Documents will not be modified and this Agreement will terminate. In that event, the Lender will have all of the rights and remedies provided by the Loan Documents; and

B.    I understand that the Loan Documents will not be modified unless and until (i) the Lender accepts this Agreement by signing and returning a copy of it to me, and (ii) the Modification Effective Date (as defined in Section 3) has occurred. I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Agreement.

3. **The Modification.** If my representations and covenants in Section 1 continue to be true in all material respects and all preconditions to the modification set forth in Section 2 have been met, the Loan Documents will automatically become modified on April 01, 2013 (the "Modification Effective Date") and all unpaid late charges that remain unpaid will be waived. I understand that if I have failed to make any payments as a precondition to this modification under a Trial Period Plan, this modification will not take effect. The first modified payment will be due on April 01, 2013.

MODIFICATION AGREEMENT
Form 3157 3/09 (rev. 10/10)
CA3157NOSB.LMA 02/21/12

JA322

**A.** The Maturity Date will be: March 01, 2043.

**B.** The modified Principal balance of my Note will include all amounts and arrearages that will be past due as of the Modification Effective Date (including unpaid and deferred interest, fees, escrow advances and other costs, but excluding unpaid late charges, collectively, "Unpaid Amounts") less any amounts paid to the Lender but not previously credited to my Loan. The new principal balance of my Note will be $169,401.47 (the "New Principal Balance"). I understand that by agreeing to add the Unpaid Amounts to the outstanding principal balance, the added Unpaid Amounts accrue interest based on the interest rate in effect under this Agreement. I also understand that this means interest will now accrue on the unpaid interest that is added to the outstanding principal balance, which would not happen without this Agreement.

**C.** $17,738.88 of the New Principal Balance shall be deferred (the "Deferred Principal Balance") and will be treated as a non-interest bearing principal forbearance. I will not pay interest or make monthly payments on the Deferred Principal Balance. In addition, $0.00 of the Deferred Principal Balance is eligible for forgiveness (the "Deferred Principal Reduction Amount"). Provided I am not in default on my new payments such that the equivalent of three full monthly payments are due and unpaid on the last day of any month, on each of the first, second and third anniversaries of November 01, 2012, the Lender shall reduce the Deferred Principal Balance of my Note in installments equal to one-third of the Deferred Principal Reduction Amount. Application of the Deferred Principal Reduction Amount will not result in a new payment schedule. The New Principal Balance less the Deferred Principal Balance shall be referred to as the "Interest Bearing Principal Balance" and this amount is $151,662.59. Interest at the rate of 5.125% will begin to accrue on the Interest Bearing Principal Balance as of March 01, 2013 and the first new monthly payment on the Interest Bearing Principal Balance will be due on April 01, 2013. My payment schedule for the modified Loan is as follows:

| Years | Interest Rate | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Estimated Monthly Escrow Payment* | Total Monthly Payment* | Payment Begins On | Number of Monthly Payments |
|-------|---------------|---------------------------|-----------------------------------------------|-----------------------------------|------------------------|-------------------|----------------------------|
| 1 | 5.125000 | 03/01/2013 | $825.78 | $116.71 | $942.49 | 04/01/2013 | 380 |

One additional payment of $17,738.88, your deferred principal balance, is due on March 01, 2043 for your loan to be paid in full.

*The escrow payments may be adjusted periodically in accordance with applicable law and therefore my total monthly payment may change accordingly.

MODIFICATION AGREEMENT
Form 3157 3/09 (rev. 10/10)
CA3157NGSE.LMA 02/21/12

Page 5

JA323

The above terms in this Section 3.C. shall supersede any provisions to the contrary in the Loan Documents, including but not limited to, provisions for an adjustable, step or simple interest rate.

I understand that, if I have a pay option adjustable rate mortgage loan, upon modification, the minimum monthly payment option, the interest-only or any other payment options will no longer be offered and that the monthly payments described in the above payment schedule for my modified Loan will be the minimum payment that will be due each month for the remaining term of the Loan. My modified Loan will not have a negative amortization feature that would allow me to pay less than the interest due resulting in any unpaid interest to be added to the outstanding principal balance.

I further understand that, provided I am not in default under the terms of this Agreement and I pay my Note in full (i) any time more than 30 calendar days after the Modification Effective Date, and (ii) prior to the application of the entire Deferred Principal Reduction Amount, I shall be fully vested in and entitled to the unapplied amount of the Deferred Principal Reduction Amount and the unapplied amount shall be deducted from my payoff balance.

D.    I will be in default if I do not comply with the terms of the Loan Documents, as modified by this Agreement.

E.    If a default rate of interest is permitted under the Loan Documents, then in the event of default under the Loan Documents, as amended, the interest that will be due will be the rate set forth in Section 3.C.

F.    I agree to pay in full the Deferred Principal Balance less any Deferred Principal Reduction Amount to which I am entitled, and any other amounts still owed under the Loan Documents by the earliest of: (i) the date I sell or transfer an interest in the Property, (ii) the date I pay the entire Interest Bearing Principal Balance, or (iii) the Maturity Date.

4.    Additional Agreements. I agree to the following:

A.    That all persons who signed the Loan Documents or their authorized representative(s) have signed this Agreement, unless (i) a borrower or co-borrower is deceased; (ii) the borrower and co-borrower are divorced and the property has been transferred to one spouse in the divorce decree, the spouse who no longer has an interest in the property need not sign this Agreement (although the non-signing spouse may continue to be held liable for the obligation under the Loan Documents); or (iii) the Lender has waived this requirement in writing.

B.    That this Agreement shall supersede the terms of any modification, forbearance, Trial Period Plan or other Workout Plan that I previously entered into with Lender.

C.    To comply, except to the extent that they are modified by this Agreement, with all covenants, agreements, and requirements of Loan Documents including my agreement to make all payments of taxes, insurance premiums, assessments, Escrow items, impounds, and all other payments, the amount of which may change periodically over the term of my Loan.

D.    That this Agreement constitutes notice that the Lender's waiver as to payment of Escrow items, if any, has been revoked, and I have been advised of the amount needed to fully fund my escrow account.

E.    That the Loan Documents as modified by this Agreement are duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed.

MODIFICATION AGREEMENT
Form 3157 3/09 (rev. 10/10)
CA3157NOSE.LMA 02/21/12

Page 6

F.    That all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and that except as otherwise specifically provided in, and as expressly modified by, this Agreement, the Lender and I will be bound by, and will comply with, all of the terms and conditions of the Loan Documents.

G.    That, as of the Modification Effective Date, notwithstanding any other provision of the Loan Documents, if all or any part of the Property or any interest in it is sold or transferred without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Mortgage. Lender shall not exercise this option if state or federal law, rules or regulations prohibit the exercise of such option as of the date of such sale or transfer. If Lender exercises this option, Lender shall give me notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which I must pay all sums secured by the Mortgage. If I fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Mortgage without further notice or demand on me.

H.    That, as of the Modification Effective Date, I understand that the Lender will only allow the transfer and assumption of the Loan, including this Agreement, to a transferee of my property as permitted under the Garn St. Germain Act, 12 U.S.C. Section 1701j-3. A buyer or transferee of the Property will not be permitted, under any other circumstance, to assume the Loan. Except as noted herein, this Agreement may not be assigned to, or assumed by, a buyer or transferee of the Property.

I.    That, as of the Modification Effective Date, if any provision in the Note or in any addendum or amendment to the Note allowed for the assessment of a penalty for full or partial prepayment of the Note, such provision is null and void.

J.    That, I will cooperate fully with Lender in obtaining any title endorsement(s), or similar title insurance product(s), and/or subordination agreement(s) that are necessary or required by the Lender's procedures to ensure that the modified mortgage Loan is in first lien position and/or is fully enforceable upon modification and that if, under any circumstance and not withstanding anything else to the contrary in this Agreement, the Lender does not receive such title endorsement(s), title insurance product(s) and/or subordination agreement(s), then the terms of this Agreement will not become effective on the Modification Effective Date and the Agreement will be null and void.

K.    That I will execute such other documents as may be reasonably necessary to either (i) consummate the terms and conditions of this Agreement; or (ii) correct the terms and conditions of this Agreement if an error is detected after execution of this Agreement. I understand that either a corrected Agreement or a letter agreement containing the correction will be provided to me for my signature. At Lender's option, this Agreement will be void and of no legal effect upon notice of such error. If I elect not to sign any such corrective documentation, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement, and I will not be eligible for a modification under the Modification Program.

L.    Mortgage Electronic Registration Systems, Inc. ("MERS") is a separate corporation organized and existing under the laws of Delaware and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, (888) 679-MERS. In cases where the loan has been registered with MERS who has only legal title to the interests granted by the borrower in the mortgage and who is acting solely as nominee for Lender and Lender's successors and assigns, MERS has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling the mortgage loan.

MODIFICATION AGREEMENT
Form 3157 3/09 (rev. 10/10)
CA3157NCSE.LMA 02/21/12

JA325

M. That Lender will collect and record personal information, including, but not limited to, my name, address, telephone number, social security number, credit score, income, payment history, government monitoring information, and information about account balances and activity. In addition, I understand and consent to the disclosure of my personal information and the terms of the Trial Period Plan and this Agreement by Lender to (i) the U.S. Department of the Treasury; (ii) FannieMae and FreddieMac in connection with their responsibilities under the Home Affordability and Stability Plan; (iii) any investor, insurer, guarantoror servicer that owns, insures, guarantees or services my first lien or subordinate lien (if applicable)mortgage loan(s); (iv) companies that perform support services for the Home Affordable Modification Program and the Second Lien Modification Program; and (v) any HUD certified housing counselor.

N. That if any document and/or this Agreement related to the Loan Documents and/or this Agreement is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the Loan as modified, or is otherwise missing, I will comply with the Lender's request to execute, acknowledge, initial and deliver to the Lender any documentation the Lender deems necessary. If the Note is replaced, the Lender hereby indemnifies me against any loss associated with a demand on the Note. All documents the Lender requests of me under this Section 4.N. shall be referred to as "Documents." I agree to deliver the Documents within ten (10) days after I receive the Lender's written request for such replacement.

O. That the mortgage insurance premiums on my Loan, if applicable, may increase as a result of the capitalization which will result in a higher total monthly payment. Furthermore, the date on which I may request cancellation of mortgage insurance may change as a result of the New Principal Balance.

*[Check box if following applies:]*
☐ P. If my Loan Documents govern a home equity loan or line of credit, then I agree that as of the Modification Effective Date, I am terminating my right to borrow new funds under my home equity loan or line of credit. This means that I cannot obtain additional advances, and must make payments according to this Agreement. (Lender may have previously terminated or suspended my right to obtain additional advances under my home equity loan or line of credit, and if so, I confirm and acknowledge that no additional advances may be obtained.)

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

MODIFICATION AGREEMENT
Form 3157 3/09 (rev. 10/10)
CA3157NGSELMA 02/21/12

Page 8

JA326

In Witness Whereof, the Lender and I have executed this Agreement.
PennyMac Loan Services

Lender
By:
Date

Carol Jean Oney _____ (Seal)                    _____ (Seal)

_____ (Seal)                                    _____ (Seal)

_____ (Seal)                                    _____ (Seal)

Gonet Linfonte
3-7-13



MODIFICATION AGREEMENT
Form 3157 3/09 (rev. 10/10)
CA3157NGSELMA 02/21/12

Page 9

JA327

# **Exhibit E**

136044.01332/101257930v.1

Case 1:15-cv-01525-JFM   Document 23-6   Filed 10/22/15   Page 2 of 2

To: 14433930416  From: 14106519639   Date: 05/26/15   Time: 7:30 PM Page: 01
Carol Oney                                                410-651-9639          p.1
Case 1:15-cv-01525-JFM   Document 1-6   Filed 05/27/15   Page 1 of 2

# PennyMac™

P.O. Box 514387
Los Angeles, CA 90051-4387

**Notice Date:** May 05, 2014

**Loan Number:**
**Property Address:**
13320 Bobtown Rd
Princess Anne MD 21853

0060386-367763/ 404061

Carol Oney
13320 Bobtown Rd
Princess Anne MD 21853

## REGARDING YOUR LOAN

PennyMac Loan Services, LLC ("PennyMac") wants to help you stay in your home and manage the financial challenges affecting your ability to pay your mortgage. As your mortgage servicer, we are fully committed to reviewing your current financial situation to see if you qualify for a loan modification or other foreclosure prevention alternative. This letter will provide you with helpful information and instructions to guide you through the process of applying for these programs.

**Property Valuation**
We may order an appraisal or other forms of valuations to determine the property's value in the course of reviewing your application. If we do order any valuations in connection with the application in determining whether your loan qualifies for a loan modification, a copy of the valuation(s) will be provided to you along with the notice approving or declining your application.

## WHY YOU RECEIVED THIS SECOND NOTICE

Your last mortgage payment was due on November 01, 2013. As a result, you may begin receiving foreclosure notices if you do not bring your mortgage current soon.

This is your SECOND notice. You may lose eligibility for a Loan Modification program if you do not return this package by May 20, 2014.

We offer many programs to avoid foreclosure. One program, in particular, is the Home Affordable Modification Program ("HAMP"), which is a federally designed program to help homeowners achieve a more affordable and sustainable mortgage payment. By providing the required documentation and information to PennyMac, we will be able to determine if you qualify for this program or other alternative to foreclosure.

To assist you through this process, I have been assigned as your single point of contact. As your single point of contact I am available to:

- Manage the required tasks to determine your eligibility for these programs, along with the time required by you to complete those activities to ensure compliance with all applicable requirements;
- Coordinate and track documents provided by you, and promptly notify you when additional information is required; and
- Provide you with a timely status of our evaluation of your application for these programs.

## WHAT WE NEED FROM YOU

To review your mortgage loan for a modification, PennyMac must receive a complete Loan Modification Application which consists of the following documents that are included in this package:

- ➤ Request for Mortgage Assistance Form
- ➤ Financial Statement Form
- ➤ Borrower's Authorization Form
- ➤ Tax Authorization Form 4506T-EZ

Take the necessary steps today to gain peace of mind and control over your financial situation.

Step 1: Complete the required forms.
Step 2: Provide supporting documentation, as outlined in the following pages.
Step 3: Return all documents to PennyMac no later than May 20, 2014 or you may lose eligibility for a Loan Modification program.
Step 4: Retain a copy of all documents for your records.

WELMOD2014

Page 1

# **Exhibit F**

136044.01332/101257930v.1

To: 14433930416  From: 14106519639    Date: 05/26/15  Time: 7:30 PM Page: 02
Carol Oney                                   410-651-9639                p.2
Case 1:15-cv-01525-JFM  Document 1-6  Filed 05/27/15  Page 2 of 2


**PennyMac**

P.O. Box 514387
Los Angeles, CA 90051-4387

Notice Date: October 06, 2014
Loan Number: 
Property Address:
13320 Bobtown Rd
Princess Anne MD 21853

5.1.192 1 MB 0.432  90224811..env 1006 000162 000487 011/002


CAROL ONEY
13320 BOBTOWN RD
PRINCESS ANNE MD 21853-3358
ıllılılılılılılılılılıllılıllılıllıdılıllılılırlıllılıllılılı

### ABOUT YOUR LOAN

PennyMac wants to work with you to resolve your delinquency issues and help you manage the financial challenges that may be affecting your ability to pay your mortgage. Let us tell you about your options and show you how we can help.

### WHAT THIS MEANS

Your monthly mortgage payment is now past due. We have not received the payment due on November 01, 2013 or any subsequent payments. As a result, you may begin receiving foreclosure notices if you do not bring your mortgage current soon.

I have been assigned as your Relationship Manager to assist you from falling further behind on your mortgage payments. My primary responsibility is to work with you and explore the home retention programs and foreclosure alternatives available to you and prevent a foreclosure sale. As your single point of contact, I am available to:

- Discuss programs and foreclosure prevention alternatives such as:

  o  Repayment Plan – Repay your delinquent balance along with your regular monthly payments over a period of time.
  o  Forbearance Plan – Make reduced payments or no payments over a period of time while you resolve the circumstance of your default. Then, enter into a Repayment Plan or apply for a Modification.
  o  Modification – Adjust the terms of your loan to potentially make your payments and/or debt more manageable based on your household finances.
  o  Short Sale – Sell your home for less than the total amount you owe on your mortgage loan without having to pay back the difference. This option may include relocation assistance to help you transition to a new home.
  o  Deed-in-Lieu of Foreclosure – Transfer ownership of your property to the lender in lieu of a foreclosure action and make no further payments on your mortgage loan. This option may also include relocation assistance.

- Manage the required tasks to determine your eligibility for those programs, along with the time required by you to complete those activities to ensure compliance with all applicable requirements;
- Coordinate and track documents provided by you, and promptly notify you when additional information is required; and
- Provide you with a timely status of the evaluation of your application for those programs.

### ACTION REQUIRED

Act now to get the help you need! Call me today to learn about your options and see if you qualify for a more affordable payment.

We offer many programs to avoid foreclosure and ensure your credit is not negatively impacted. The sooner we know what you're facing, the more we can do to help you work through it.



This is an attempt by a debt collector to collect a debt. However, if your account is subject to pending bankruptcy proceedings or if you have received a discharge in bankruptcy, this statement is for informational purposes only and is not an attempt to collect a debt against you personally.

SPOC Intro Letter 9-2014